COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| MIDDLESEX, ss. | SUPERIOR COURT DEPARTMENT |

)
RACHEL FREEDMAN, individually and )
on behalf of all others similarly situated, )
    Plaintiff, )
)
v.                                           )     C.A. No.:
)
DAN O'BRIEN KIA NORWOOD, )
DMO NORWOOD, LLC, and )
DAN O'BRIEN AUTO GROUP )
    Defendants. )
)

## CLASS ACTION COMPLAINT

**I.**    **INTRODUCTION**

       1.    Car dealerships are no strangers to unfair and deceptive business practices. Faced with an industry rife with fraud dating as far back to the 1950s, the United States Government was compelled to pass the Automobile Information Disclosure Act ("AIDA") – a law designed to provide transparency and limit deception in vehicle pricing. *See* 15 U.S.C., §§ 1231-1233. Among the simple and straightforward mandates of the AIDA, a vehicle's manufacturer is obligated to list several features of a vehicle, including make, model, identification number, and retail price on a "sticker" affixed to the vehicle.[1] *See* 15 U.S.C., § 1232. The dealer, in turn, is required to ensure that the "sticker" is not altered or removed. *See* 15 U.S.C., § 1233. Having learned nothing since the 1950s, the Dan O'Brien family of car dealerships in Massachusetts is content on perpetrating egregious fraud as opposed to selling cars honestly, with dignity, and in

---

[1] These AIDA mandated disclosures are listed on a sticker that is affixed to the vehicle's window. The disclosure is commonly referred to as a "Monroney Sticker" – Monroney being the name of the Oklahoma senator who sponsored the bill – the car's "window sticker," or simply the "sticker."

compliance with Massachusetts and federal law.  Vitally, the defendants systematically alter "stickers" on the cars it sells, to give the appearance that the vehicles come with a higher retail sales price than that which is set by the manufacturer, offered for sale at the dealerships, and advertised to the general public through various medium.  The defendants' deception and fraud comes with a steep price for their customers, who unwittingly fall victim to a scam designed to add unlawful surcharges and markups to these already expensive consumer transactions.

2. But the defendants are not content at simply altering the "stickers" they are prohibited from altering.  The defendants also engage in a systematic pattern of, among other schemes, imposing unlawful surcharges and markups, engaging in deceptive drip pricing scams, and delivering vehicles that are different from those that the consumer contracted to purchase.

3. Because the law requires and encourages transparency, honesty, integrity, and fairness in consumer transactions, this lawsuit seeks to hold the Dan O'Brien Auto Group accountable for the fraud, deception and dishonesty that affects each and every sale that takes place at all of the dealerships it owns or operates in Massachusetts.

**II. PARTIES**

4. Plaintiff Rachel Freedman is an individual residing in Chestnut Hill, Massachusetts.

5. Defendant Dan O'Brien Kia Norwood is a car dealership located at 105 Boston-Providence Highway, Norwood, Massachusetts.

6. Defendant DMO Norwood, LLC, is a Massachusetts limited liability company with a principal place of business located at 105 Boston-Providence Highway, Norwood, Massachusetts

7. Dan O'Brien Auto Group is a family of car dealerships that share similar

ownership and operational resources. It includes, without limitation, the following Massachusetts car dealerships:

- Infinity of Hanover, Hanover, Massachusetts.
- Dan O'Brien Kia Norwood, Norwood, Massachusetts.
- Dan O'Brien Chrysler, Dodge, Jeep and Ram, Methuen, Massachusetts.
- Dan O'Brien Nissan, Chelmsford, Massachusetts.

8. Upon information and belief, DMO Norwood, LLC does business as Dan O'Brien Kia Norwood, which is a member of the Dan O'Brien Auto Group. Collectively, all defendants will be referred to herein as "DMO."

9. The unlawful business practices discussed herein are uniformly carried out at all dealerships operating under the Dan O'Brien Auto Group brand.

### III.   FACTUAL ALLEGATIONS

10. On October 12, 2019, the plaintiff purchased a vehicle from DMO.

11. At all times during the sales process, the plaintiff sought to purchase, and agreed to purchase, a 2020 Kia Telluride EX All-Wheel Drive ("AWD") sports utility vehicle.

12. The retail sales price for the 2020 Kia Telluride EX AWD, as advertised by DMO and as listed by the manufacturer on the "sticker" was $40,460.00.

13. In violation of Massachusetts law, through the addition of three unlawful fees designed to further DMO's "drip pricing" scheme, the plaintiff ultimately paid $46,057.69 – well above the stated retail price for their vehicle.

#### A.   UNLAWFUL ALTERATIONS TO VEHICLES' "STICKERS"

14. To increase the price consumers pay, DMO engages in an unlawful scam known as the "addendum fee" scam.

15. Under this scam, DMO creates a document and places it next to (or beneath) the "sticker" that is required to be affixed to the car under federal law. It has the same look as the "sticker," using similar fonts and colors. It is designed to look like the official "sticker" so as to deceive the consumer into believing it is a federally mandated disclosure.

16. However, the "addendum" is not part of the federally mandated disclosure required by AIDA. Instead, it is a forgery since federal law prohibits a dealer from altering the actual "sticker." *See* 15 U.S.C., § 1233(c).

17. The purpose of the "addendum" is to alter the retail sales price of a vehicle to achieve a significant markup. Although the purpose of the "addendum fee" on the Telluride plaintiff purchased might have been, in part, to markup the price based on artificially created high demand,[2] DMO also utilizes this scam to charge customers for maintenance and lifetime warranties that DMO advertises as free benefits. *See* 940 CODE MASS. REGS., § 6.05(16).

18. The fact that DMO resorts to tricking its customers by hiding these fees in documents designed to look like the actual "sticker" (rather than being transparent in its pricing practices) evidences DMO's willful and knowing intent.

19. This scam is, upon information and belief, carried out on all car sales made at all DMO dealerships.

   **B.   DOCUMENTARY AND TITLE PREPARATION FEES**

20. Every vehicle DMO sells includes a fee called the "documentary preparation fee."

---

[2] DMO falsely created the appearance of artificial demand by refusing to sell vehicles it had in inventory and/or advertised as being in its inventory, and by refusing to employ the inter-dealership locator function to obtain equipment from other dealers with ease. DMO continues to claim there is a high demand for its Telluride model despite car sales coming to a screeching halt as a result of the COVID-19 pandemic. *See* Wayland, M., *Coronavirus Pandemic Tanks US Auto Sales in April*, CNBC (May 1, 2020) <https://www.cnbc.com/2020/05/01/coronavirus-pandemic-tanks-us-auto-sales-in-april.html> (reporting a nearly 40% decline in Kia new car sales compared to a year ago).

4

21. Every vehicle DMO sells includes a fee called the "title preparation fee."

22. These two fees are added to the price of the vehicle by the backroom finance department after the sales price is agreed upon with the consumer and the salesman.

23. These fees are mandatory.

24. These fees are non-negotiable.

25. These fees are not disclosed on the vehicle's "sticker."

26. The fees charged to the plaintiff – fees that were imposed after the sales price was agreed upon – were $599.00 and $75.00 for the "documentary preparation fee" and "title preparation fee," respectively.

27. DMO represented to its customers, including the plaintiff, that the purpose of these fees was to prepare documentation relating to the sale of the vehicle, including the preparation of the vehicle's title.

28. These representations were false.

29. These fees are nothing more than unlawful dealer markups or surcharges.

30. While charging these fees is, in and of itself, an unfair and deceptive practice proscribed by Massachusetts law,[3] DMO lack of transparency and lies surrounding the purpose and nature of these fees make a bad situation far more unfair and deceptive.

31. DMO unfairly and deceptively fabricates a name for these fees to falsely create a justification for imposing significant markups or surcharges.  It does this because being transparent and honest and calling these fees what they actually are (i.e., "surcharges" or "markups") would be met with disfavor resulting in customers refusing to pay.

---

[3] Even if these fees were properly identified as "markups" or "surcharges" to the consumer, they are still unlawful as they result in final sales prices greater than advertised or labeled, and prices that are greater than the sales prices agreed to by and between customers and their salesmen.

32.     Instead, DMO is left with no choice but to turn to deception to get away with imposing these otherwise unlawful fees. It does this by falsely claiming the fee is designed to cover costs to prepare documentation. However, the name of these fees bares no semblance to the purported purpose of the fee. This is because there is no conceivable way that DMO can justify charging such a high price (i.e., $674.00) for basic document preparation.

33.     Indeed, under Massachusetts law, a dealer is prohibited from charging a customer more than $5.00 to prepare a title. *See* G. L. c. 90D, § 33.

C.   **THE BAIT AND SWITCH**

34.     When the plaintiff took delivery of her vehicle, she was not given a copy of the vehicle's "sticker."

35.     DMO failed to provide the "sticker" to the plaintiff, despite being required under federal law to do so. *See* 15 U.S.C., § 1233.

36.     The reasons DMO failed to provide "stickers" are evident. First, the "sticker" would have revealed that DMO was engaged in the "addendum fee" scam. By providing the plaintiff with the "sticker," the plaintiff would have learned that the "addendum" was a forgery added by the dealership contrary to federal and state law.

37.     Second, the "sticker" would have revealed that the "documentary preparation" fees and "title preparation" fees were not included in the retail sales price.

38.     Third, the "sticker" would have shown that at the eleventh hour, DMO had inexplicably switched vehicles it ultimately delivered to the plaintiff.

39.     The plaintiff, at all relevant times, inquired about and entered into a sales transaction with DMO to purchase an AWD model of the Kia Telluride.

40.     However, without notice to the plaintiff, DMO delivered a front-wheel drive

6

("FWD") model.

41. Even some of the paperwork drafted by DMO indicated that the purchased vehicle was equipped with AWD; none of the paperwork drafted by DMO expressly identified the vehicle as being an FWD model.

42. Many of the fields on the bill of sale that might have identified the vehicle as being FWD were left blank intentionally so as to conceal this fraud.

43. After taking delivery of the vehicle, the plaintiff suspected that it was FWD when the car performed poorly in the first snowstorm after purchase.

44. Eventually, DMO confirmed and conceded that the vehicle was FWD.

45. The plaintiff immediately sought to exchange the vehicle so that she could take possession of an AWD model, as agreed.

46. DMO was at first hesitant to replace the vehicle. It falsely claimed that it was unable to locate and/or acquire an AWD model, despite several such models being shown in its online inventory and offered for sale through its website.[4]

47. During this time, DMO informed the plaintiff that she could continue to drive the FWD model without charge or penalty while an AWD model DMO was willing to give to plaintiff could be acquired.

48. DMO later agreed to exchange vehicles at no added cost to the plaintiff. But, rather than swap out the equipment, as agreed, DMO instead attempted to treat the transaction as a new vehicle sales (presumably to gain some advantage or meet some sales metric or quota set by the manufacturer) with a concurrent trade-in of the FWD model.

49. DMO went so far to falsely claim that there was damage to the FWD model and

---

[4] DMO also made no effort to use the inter-dealership locate function to acquire an AWD model.

demanded further depreciation for the miles the plaintiff put on the FWD model, notwithstanding its earlier representations to the contrary. All this was done to increase the delta between new and used vehicle prices and force the plaintiff to pay even more.

50. As a result of the trumped-up damage and depreciation occasioned by DMO's lack of urgency in locating a replacement AWD vehicle, DMO insisted that the plaintiff pay $8,000.00 to cover the difference in models.[5]

51. The plaintiff refused to be victimized a second time and was left with no choice but to leave the dealership without the promised exchange.

52. Upon information and belief, this bait and switch tactic is a systematic problem that affects numerous DMO customers.

## IV.   CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a) and (b) of the Massachusetts Rules of Civil Procedure and G. L. c. 93A, § 9(2) on behalf of a class to be defined at the class certification stage of this litigation that is likely to include, but is not limited to:

> All consumers who purchased an automobile from any Dan O'Brien Auto Group dealership in Massachusetts from April 13, 2014 to the present (the "Class").[6]

54. Certification of plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

---

[5] This would have been on top of the $5,597.69 the plaintiff already paid in excess of the labeled and advertised retail sales price on the vehicle. Indeed, DMO sought to sell plaintiff a car at $13,597.69 over retail price.

[6] The plaintiff reserves the right to amend the class definition if further information and discovery indicates that the class definition should be narrowed, expanded, or otherwise modified, including but not limited to, the creation of multiple classes or subclasses.

55. Numerosity – MASS. R. CIV. P. 23(a)(1). The Class is so numerous that individual joinder of all Class members is impracticable. Plaintiff believes that there are thousands of Class members. The precise number of Class members and their addresses are unknown to plaintiff, but may be ascertained from DMO's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

56. Commonality and Predominance – MASS. R. CIV. P. 23(a)(2) and 23(b). This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members. All Class members were subject to the same deception and unlawful conduct.

57. Typicality – MASS. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through the uniform misconduct described herein and all Class members have the same claim, *i.e.,* that DMO engaged in unfair and deceptive pricing and other business practices such as uniform implementation of the "addendum fee" scam, charging unlawful "documentary" and "title preparation" fees, and unlawfully switching equipment without the customer's knowledge.

58. Adequacy of Representation – MASS. R. CIV. P. 23(a)(4) and G. L. c. 93A, § 9(2). Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; she has retained counsel competent and experienced in class action litigation, and plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by plaintiff and counsel.

59. Similarly Situated and Injured Persons – G. L. c. 93A, § 9(2). The proposed Class consists of customers who have suffered the same injury as the plaintiff and who, for the reasons

stated above, are similarly situated to each other and to the plaintiff.

60. Superiority – Mass. R. Civ. P. 23(b). A class action is superior to any other available methods for fairly and efficiently adjudicating this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against DMO, so it would be impracticable for Class members to individually seek redress for DMO's wrongful conduct. Even if the Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V. CAUSES OF ACTION

### COUNT ONE
**Unfair and Deceptive Business Practices, G. L. c. 93A, §§ 2 and 9**

61. Plaintiff realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

62. At all relevant times, DMO was engaged in commerce for purposes of G. L. c. 93A.

63. G. L. c. 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." G. L. c. 93A, § 9 permits any consumer injured by a violation of c. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

64. DMO engaged in a pattern of deceitful, intentionally misleading, unfair, and

10

deceptive conduct including, but not limited to the conduct described in paragraphs 65 through 78, below.

65. DMO acted unfair and deceptively in falsifying "addenda" that were affixed to each vehicle it sold so that the consumer would erroneously believe that the fees included on the "addenda" were part of the federally mandated disclosures that listed, among other items, the retail sales price of the vehicle. *See* 15 U.S.C., §§ 1231-1233.

66. DMO acted unfairly and deceptively in violating the AIDA that prohibits dealerships from altering or amending the "window sticker." *See* 15 U.S.C., § 1233.

67. DMO acted unfairly and deceptively in violating the AIDA that requires the dealership to give the "sticker" to the consumer at delivery. *See* 15 U.S.C., § 1233.

68. DMO acted unfairly and deceptively by charging customers in excess of the amount of its advertised price and/or the price stated on the price tag or "sticker" for these vehicles. *See* 940 CODE MASS. REGS., § 3.13(1)(f).

69. DMO acted unfairly and deceptively in failing to properly affix to each vehicle the price at which the vehicles were to be sold. *See* 940 CODE MASS. REGS., § 3.13(1)(a).

70. DMO acted unfairly and deceptively by engaging in a drip price scam designed to increase the price of the vehicles sold to a price that was higher than the advertised price or price offered for sale. *See* 940 CODE MASS. REGS., § 3.13(1)(f).

71. DMO acted unfairly and deceptively by engaging in a drip price scam designed to increase the price of vehicles sold after an agreed upon sales price is reached between the customer and salesman. *See* 940 CODE MASS. REGS., § 5.04(10).

72. DMO acted unfairly and deceptively by advertising vehicles for sale that were not available to be delivered to the customer. *See, e.g.*, 940 CODE MASS. REGS., § 3.02(1).

73. DMO acted unfairly and deceptively by falsifying the purpose of assessing "documentary preparation" fees.

74. DMO acted unfairly and deceptively by falsifying the purpose of assessing "title preparation" fees.

75. DMO acted unfairly and deceptively in charging in excess of $5.00 for title preparation.  *See* G. L. c. 90D, § 33.

76. Plaintiff and Class members were injured by DMO's conduct as alleged herein by purchasing vehicles based on unlawful fees, improper disclosures, and outright lies concerning the nature of surcharges and markups that were charged to the consumer.

77. All of these unfair and deceptive practices were carried out systematically and uniformly at all of DMO's Massachusetts dealerships.

78. All other claims, causes of action, and conduct described herein constitute per se violations of Chapter 93A.

79. DMO's unfair and deceptive acts or practices, as alleged herein, were and are willful and knowing violations of G. L. c. 93A, § 2.

80. On or about April 13, 2020, plaintiff made a demand for relief, in writing, to DMO, on behalf of herself and the Class as required by G. L. c. 93A, § 9(3).

81. DMO failed to respond to the Chapter 93A demand letter with a reasonable offer of settlement.  Instead, DMO continued to provide false and misleading information about the consumer transaction and used the good faith demand/offer of settlement requirement of Chapter 93A as a way to further its deception.  In one instance, DMO went so far to state "[a]t this time, unfortunately, an AWD Telluride is not available," while simultaneously advertising 25 AWD Telluride vehicles available for sale on its website.  *See, e.g.*, 940 CODE MASS. REGS., § 3.02(1).

82. Based on the foregoing, plaintiff and the other members of the Class are entitled to all remedies available pursuant to G. L. c. 93A, § 9, including, but not limited to actual damages, statutory damages (to the extent that they are greater than actual damages), double or treble damages, disgorgement of DMO's profits derived from its unlawful activities, injunctive relief, attorneys' fees and other reasonable costs.

### COUNT TWO
#### UNJUST ENRICHMENT

83. Plaintiff realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

84. Plaintiff and the other Class members conferred a benefit upon DMO in the payments they provided to DMO to purchase their vehicles.

85. DMO had an appreciation or knowledge of the commercial value of the payments paid by the plaintiff and the other members of the Class.

86. DMO's acceptance or retention of these benefits is inequitable under the circumstances outlined above and entitles plaintiff and Class members to restitution or such other compensation as is appropriate in the circumstances.

### COUNT THREE
#### BREACH OF CONTRACT

87. Plaintiff realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

88. Plaintiff and members of the Class entered into contracts with DMO to purchase vehicles.

89. Plaintiff and members of the Class have fully performed all covenants, conditions and obligations required by them, except to the extent made impossible by DMO's breach of

these contracts.

90. DMO breached these agreements by engaging in a drip pricing scam designed to charge customers more than the prices they agreed to pay.

91. As a direct and proximate cause of DMO's breach, the plaintiff and members of the Class have incurred significant financial damages.

## COUNT FOUR
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

92. Plaintiff realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

93. Plaintiff and members of the Class entered into sales contracts to purchase vehicles from DMO.

94. These contracts between the parties came with an implied duty of good faith and fair dealing.

95. DMO breached this duty by falsifying "addenda" in an attempt to charge more for these vehicles than the retail sales price and/or advertised price.

96. DMO breached this duty by engaging in drip pricing schemes designed to increase the price of the vehicle after prices were agreed to between the parties.

97. As a direct and proximate cause of DMO's breaches, plaintiff and members of the Class have incurred significant financial damages.

## COUNT FIVE
### FRAUD

98. Plaintiff realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

99. DMO falsely and fraudulently created "addenda," which were intentionally

designed by DMO to be confused with the federally mandated "sticker" of the vehicles it offered for sale. These "addenda" were not, in fact, part of the actual "sticker," but instead forgeries designed to alter or amend the disclosures, including retail sales price, that were required to be disclosed to the consumer under state and federal law.

100. The false statements contained on the "addenda" were material to each sales transaction. This is because the "addenda" falsely asserted that the retail sales price of each vehicle was higher than the prices advertised by the dealer, prices advertised by the manufacturer, and prices listed on each vehicle's "sticker."

101. The purpose of the "addendum fee" scam was to induce the consumer into paying more for the vehicle than the advertised and/or stated retail sales price.

102. The plaintiff and members of the Class justifiably relied on the forgeries contained on the "addenda" in paying more for the vehicles than they otherwise would have had to pay had DMO not unlawfully altered the "stickers" to deceive its customers.

103. As a direct and proximate result of DMO's fraudulent conduct, the plaintiff and members of the Class have suffered damages by way of increased prices paid for the vehicles they purchased.

## VI.   PRAYER FOR RELIEF

WHEREFORE, the plaintiff Rachel Freedman, individually and on behalf of the other members of the Class, respectfully requests that the Court order the following relief:

A. An Order certifying the Class as requested herein;

B. Actual damages or statutory damages in an amount to be determined at trial;

C. Double or treble damages, as afforded by law;

D. An Order enjoining DMO from continuing to engage in the unfair and deceptive acts or practices alleged;

15

E. Reasonable attorneys' fees and costs to plaintiff and the Class; and

F. Such other and further relief as may be just and proper.

## VII. JURY DEMAND

Plaintiff and the Class demand a trial by jury of all claims in this Complaint so triable.

Respectfully submitted,

Joshua N. Garick (BBO #674603)
LAW OFFICES OF JOSHUA N. GARICK, P.C.
34 Salem Street, Suite 202
Reading, Massachusetts 01867
Phone: (617) 600-7520
Joshua@GarickLaw.com

*Counsel for Plaintiff and the Class*

Dated: May 28, 2020