UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

RACHEL FREEDMAN, and )
JEFFREY GREENBERG, individually and )
on behalf of all others similarly situated, )
  Plaintiff, )
)
v. )
)
DAN O'BRIEN KIA NORWOOD, )
DMO NORWOOD, LLC, and )
DAN O'BRIEN AUTO GROUP )
  Defendants. )
_____ )

C.A. No.: 1:20-cv-11369-RWZ

(*Leave to amend granted August 12, 2020*)

## FIRST AMENDED CLASS ACTION COMPLAINT

## I.  INTRODUCTION

1.  Car dealerships are no strangers to unfair and deceptive business practices. Faced with an industry rife with fraud dating as far back to the 1950s, the United States Government was compelled to pass the Automobile Information Disclosure Act ("AIDA") – a law designed to provide transparency and limit deception in vehicle pricing. *See* 15 U.S.C., §§ 1231-1233. Among the simple and straightforward mandates of the AIDA, a vehicle's manufacturer is obligated to list several features of a vehicle, including make, model, identification number, and retail price on a "sticker" affixed to the vehicle.[1] *See* 15 U.S.C., § 1232. The dealer, in turn, is required to ensure that the "sticker" is not altered or removed. *See* 15 U.S.C., § 1233. Having learned nothing since the 1950s, the Dan O'Brien family of car dealerships in Massachusetts is

_____

[1] These AIDA mandated disclosures are listed on a sticker that is affixed to the vehicle's window. The disclosure is commonly referred to as a "Monroney Sticker" – Monroney being the name of the Oklahoma senator who sponsored the bill – the car's "window sticker," or simply the "sticker."

content on perpetrating egregious fraud as opposed to selling cars honestly, with dignity, and in compliance with Massachusetts and federal law.  Vitally, the defendants systematically alter "stickers" on the vehicles it sells, to give the appearance that the vehicles come with a higher retail sales price or manufacturer's suggested retail price ("MSRP") than that which is set by the manufacturer, offered for sale at all Kia dealerships, and advertised to the general public through various medium.  The defendants' deception and fraud comes with a steep price for their customers, who unwittingly fall victim to a scam designed to add unlawful surcharges and markups to these already expensive consumer transactions.

2.      But the defendants are not content at simply altering the "stickers" they are prohibited from altering.  The defendants also engage in a systematic pattern of, among other schemes, imposing unlawful surcharges and markups, engaging in deceptive drip pricing scams, and delivering vehicles that are different from those that the consumer contracted to purchase.

3.      Because the law requires and encourages transparency, honesty, integrity, and fairness in consumer transactions, this lawsuit seeks to hold the Dan O'Brien Auto Group accountable for the fraud, deception and dishonesty that affects each and every sale that takes place at all of the dealerships it owns or operates in Massachusetts.

## II.      PARTIES

4.      Plaintiff Rachel Freedman is an individual residing in Chestnut Hill, Massachusetts.

5.      Plaintiff Jeffrey Greenberg is an individual residing in Chestnut Hill, Massachusetts.

6.      Defendant Dan O'Brien Kia Norwood is a car dealership located at 105 Boston-

Providence Highway, Norwood, Massachusetts.

      7.     Defendant DMO Norwood, LLC, is a Massachusetts limited liability company with a principal place of business located at 105 Boston-Providence Highway, Norwood, Massachusetts

      8.     Dan O'Brien Auto Group is a family of car dealerships that share similar ownership and operational resources.  It includes, without limitation, the following Massachusetts car dealerships:

➢     Infinity of Hanover, Hanover, Massachusetts.

➢     Dan O'Brien Kia Norwood, Norwood, Massachusetts.

➢     Dan O'Brien Chrysler, Dodge, Jeep and Ram, Methuen, Massachusetts.

➢     Dan O'Brien Nissan, Chelmsford, Massachusetts.

      9.     Upon information and belief, DMO Norwood, LLC does business as Dan O'Brien Kia Norwood, which is a member of the Dan O'Brien Auto Group.  Collectively, all defendants will be referred to herein as "DMO."

      10.    The unlawful business practices discussed herein are uniformly carried out at all dealerships operating under the Dan O'Brien Auto Group brand.

**III.    FACTUAL ALLEGATIONS**

      11.    On October 12, 2019, the plaintiffs purchased a vehicle from DMO.

      12.    At all relevant times during the sales process that took place on October 12, 2019, the plaintiffs sought to purchase, and agreed to purchase, a 2020 Kia Telluride EX All-Wheel Drive ("AWD") sports utility vehicle.

      13.    The retail price or MSRP for the 2020 Kia Telluride EX AWD, as advertised by

DMO and as listed by the manufacturer on the "sticker" was $40,460.00.

14.     In violation of Massachusetts law, through the addition of three unlawful fees designed to further DMO's "drip pricing" scheme, the plaintiffs ultimately paid $46,057.69 – well above the stated retail price for their vehicle.

15.     This is not a situation where plaintiffs are upset that they paid too much for their vehicle.  For the reasons stated below, this is a situation where the plaintiffs were unwittingly deceived into paying more based on false statements made by DMO in advertisements and in statements made throughout the sales process, as well as forgeries carefully and artfully crafted by DMO to resemble federally mandated pricing disclosures.

A.     UNLAWFUL ALTERATIONS TO VEHICLES' "STICKERS"

16.     To increase the price consumers pay, DMO engages in an unlawful scam known as the "addendum fee" scam.

17.     Under this scam, DMO creates a document and places it next to the "sticker" that is required to be affixed to the car under federal law.  It has the same look as the "sticker," using similar fonts, colors, icons and illustrations.  It is designed to look like the official "sticker" so as to deceive the consumer into believing it is a federally mandated disclosure.

18.     However, the "addendum" is not part of the federally mandated disclosure required by the AIDA.  Instead, it is a forgery since federal law prohibits a dealer from altering the actual "sticker."  *See* 15 U.S.C., § 1233(c).

19.     The fact that DMO resorts to tricking its customers by hiding these fees in documents designed to look like the actual "sticker" (rather than being transparent in its pricing practices) evidences DMO's willful and knowing intent.

20.     This scam is, upon information and belief, carried out on all car sales made at all

DMO dealerships.

21.     When the plaintiffs were at DMO's Kia dealership on October 12, 2019, they were presented with and reviewed a "sticker" and an "addendum" that was affixed to the vehicle that plaintiffs sought to purchase.[2]

22.     The "sticker" was affixed by the manufacturer in accordance with federal law.

23.     The "sticker" listed the retail value as $40,460.00.

24.     The "addendum" was also affixed to the vehicle, but it was affixed by DMO, not the manufacturer.

25.     The total sales price listed on the "addendum" was $45,455.00.[3]

26.     For illustrative purposes only, a copy of a sample "addendum" used by DMO is attached herewith as "Exhibit A."[4]

27.     The picture in Exhibit A can be described as follows.  The disclosure that runs from the bottom to a line about nine-tenths the way up the page (ending above the Kia logo) is the "sticker."  The remaining tenth of the picture on the top is the "addendum" added by DMO.

28.     The "addendum" is artfully crafted to look just like the "sticker."  The colors,

---

[2] The plaintiffs believed the "addendum" was part of the "sticker" and did not learn it was a forgery until after they purchased their vehicle.

[3] In total, the plaintiffs paid $48,082.69 for their vehicle, which included a $10,000.00 cash down payment, $11,665.00 trade-in allowance, and $26,417.69 being financed.

[4] This document was attached to a now-withdrawn motion to dismiss filed by DMO in this case. Although DMO admits that this is "the *type* of addendum that would have been affixed to the vehicle [plaintiffs] purchased," it is not the actual one that was attached to the plaintiffs' vehicle. *See* DKT. 10, at pg. 3 (emphasis supplied).  It is shown here to illustrate the type of deception engaged in by DMO.  Although produced as an exhibit here for illustrative purposes, the plaintiffs do not concede its authenticity.   The plaintiffs will not concede that all information contained on this exhibit was contained on the "addendum" affixed to their vehicle, until the same is confirmed during discovery.  With that disclaimer in mind, the plaintiffs state, upon information and belief, that this "addendum" was similar to the one they observed to be affixed to the vehicle they purchased on October 12, 2019.

fonts, icons and illustrations – all drawn by DMO – are meant to replicate the colors, fonts, icons

and illustrations used by the manufacturer on the "sticker."

29.     For example, the EPA/DOT Fuel Economy and Environmental Label, the

Protecting-The-Consumer® Label, the Smog Rating, Fuel Economy & Greenhouse Gas Rating

(including fuel savings spectrum), and the "Please Recycle" logo that all appear on the

"addendum," align with those disclosures that are made on the "sticker," and use similar fonts,

colors, icons and illustrations of those disclosures that appear on the "sticker."

30.     This is designed to cause consumer confusion, as it is intentionally designed to

deceive the consumer into believing the "addendum" is part of the federally mandated

disclosures on the "sticker."  Indeed, it did cause the plaintiffs confusion as they believed the

information to be authentic (as opposed to a forgery) and reasonably relied on it when

purchasing their vehicle.

31.     Because this was created by DMO, none of the parties identified on the

"addendum," such as the manufacturer (Kia), the U.S. Environmental Protection Agency, the

U.S. Department of Transportation, have endorsed the statements made on the "addendum" or

consented to their logos or information being used on the "addendum."  Rather, it appears as

though DMO, without consent of these federal agencies, is purporting to impersonate these

agencies or otherwise make statements on behalf of these governmental agencies.

32.     On October 12, 2019, when the plaintiffs were presented with and reviewed the

"addendum" affixed to their vehicle by DMO, they believed the disclosures were mandated by

the federal government and/or the manufacturer.  They believed that the pricing disclosure was

set by the manufacturer.  They believed the car they were buying had a higher fair market value

than it actually did.  They based their negotiation positions on the price contained on the

"addendum," under the false and mistaken belief that the price listed in the "addendum" was set by the manufacturer and uniformly applied by all Kia dealerships across the nation.  Had they been informed that the pricing information was inaccurate, they would have gone to another dealership that used accurate information without resorting to blatant forgery to deceive its customers.

33.     The disclosures made in these "addenda" also serve as proof that DMO violates other pricing disclosure laws in Massachusetts.

34.     To justify the marked-up price that is deceptively added by DMO in the "addendum," DMO lists several items that are offered to all DMO customers for free as part of DMO's so-called "Awesome Protection Plan."  This includes, without limitation, (1) one year of free maintenance; (2) one year of dent repair; (3) free safety inspections for the customer's entire household; (4) free lifetime powertrain warranty.

35.     DMO, however, actually advertises on its own website that there is no cost for these benefits, including the lifetime warranty:

> **Q: What does Warranty Forever really cost??**
> **A: "There is truly NO ADDITIONAL COST to you."**
> Warranty Forever is given to you as an additional benefit of doing business with Dan O'Brien Kia. We do not SELL Warranty Forever, we offer it at NO ADDITIONAL CHARGE, to give you the peace of mind to buy from us with confidence. We cannot, and will not, offer the vehicle you buy from us at a lower price by taking away your Warranty Forever.
>
> **Q: What's the CATCH?**
> **A: "Easy, there is NO CATCH."**
> Warranty Forever is a real insurance product that is backed by Assurant Insurance Company and underwritten by the American Bankers Insurance Company. Your Warranty Forever is honored nationwide.[5]

---

[5] www.danobrienkiaconcord.com/warranty-forever.  A video about the warranty having no cost, no catches and no gimmicks can be viewed here:  www.youtube.com/watch?v=bqFl69qiRaQ.

36.     Although the benefits included in the "Awesome Protection Plan" are advertised as free to all DMO customers, DMO is also using its practice of unlawfully affixing the forged "addenda" to the "sticker" to charge its customers thousands of dollars for these free services.

37.     This deception is in direct violation of Massachusetts law.  *See* 940 CODE MASS. REGS., § 6.05(16).

38.     In the end, DMO has essentially established a two-tiered approach to its fraud. First, it has unlawfully altered the "stickers" to add a significant markup to its vehicles based on the false allusion that the retail price set by the manufacturer and disclosed in accordance with federal law is higher than it actually is.  Then, if DMO is unable to deceive its customers using this fraudulent ploy, it attempts to pass off the higher price listed on the "addenda" by claiming it is to pay for services that are offered for free.[6]

39.     The plaintiffs here fell victim to both deceptive ploys.  Upon reviewing the "sticker" and "addendum" at the dealership on October 12, 2019, the plaintiffs, not realizing that the "addendum" was a forgery added by DMO (instead believing the entire disclosure was just the "sticker"), believed that the pricing listed on the "addendum" was the price set by the manufacturer that was charged uniformly at all Kia dealerships.

40.     The plaintiffs reasonably relied on this false disclosure in negotiating a price for the vehicle.  Their reliance was reasonable for many reasons including, without limitation, the fact that the DMO artfully crafted the "addendum" to look just like the "sticker" in a manner designed to make all consumers believe they were looking at the actual "sticker," not a forgery.

---

[6] In practice, if the customer ferrets out this fraudulent scheme and is not duped by one of these two grossly fraudulent practices, the customer will have left without buying a car from DMO. This is because the car is either grossly overpriced compared to the price a consumer could pay if the car was purchased from an honest dealership, or the customer is so turned off by the unlawful, sleazy and deceptive business practices that they will chose to do business elsewhere.

Had they known the "addendum" was added by DMO in violation of federal law, they would have gone to another dealership who does not engage in systematic deception in its pricing practices and/or altered their negotiation positions accordingly.

41.     Of course, this is exactly what DMO intended to happen when it made the willful and knowing decision to affix these unlawful "addenda" (that look like "stickers") to the "stickers."

42.     But it is not just the "addenda" that falsely lists an inflated MSRP beyond that which was set by the manufacturer as required by federal law.  At all relevant times during the sales process, DMO falsely refers to the price on the "addenda" as the vehicle's MSRP.  This includes discussions with DMO salespersons and sales managers, and even references on its website.

43.     For example, the vehicle's "sticker" and "addendum" shown in Exhibit A refers to the disclosures made on a 2020 Kia K900 Luxury Sedan with stock number 020625 and VIN No. KNAS24J61L6020625.

44.     According to the "sticker," the MSRP for this vehicle is $60,995.00.  *See* Ex. A.

45.     The MSRP for a specific car will never change – it is a firm price set by the manufacturer in accordance with the AIDA.  For this vehicle, the MSRP is $60,995.00.  *See id*.

46.     At this very moment, however, DMO is falsely advertising this very same car (same stock number and same VIN) as having an MSRP of $65,990.00 (not the actual MSRP of $60,995.00).

47.     The following is a screenshot from DMO's website relating to this vehicle, which falsely lists the inaccurate and inflated MSRP:



*See* https://www.danobrienkianorwood.com/inventory?type=new&model=K900 (accessed Aug. 12, 2020).

48.     The difference between the advertised MSRP of $65,990.00 and the actual MSRP of $60,995.00 is the $4,995.00 increase added by this car's "addendum."  *See* Ex. A.

49.     This example is the exact same type of deception DMO uses to sell all of its vehicles, including those sold to the plaintiffs and other members of the Class.  All advertisements, discussions and negotiations are based on the fraudulently inflated MSRP, not the actual MSRP set by the manufacturer in accordance with federal law.

50.     The MSRP is a metric used by consumers to ascertain the fair market value ascribed by the manufacturer.  It is relied on by consumers because it is governed by federal law requiring it to be accurate and unaltered.  It is the only objective criteria a customer can rely on when purchasing a new vehicle.  By affixing documents to cars with no purpose other than to falsely inflate the MSRP – and then by using this falsely inflated MSRP in all of its advertisements and discussions with customers – the plaintiffs and all DMO customers are not being given correct information that can be used to make informed decisions about the cars they are about to purchase.

**B.**   **DOCUMENTARY AND TITLE PREPARATION FEES**

51.     Every vehicle DMO sells includes a fee called the "documentary preparation fee."

52.     Every vehicle DMO sells includes a fee called the "title preparation fee."

53.     These two fees are added to the price of the vehicle by the backroom finance department after the sales price is agreed upon with the consumer and the salesman.

54.     These fees are mandatory.

55.     These fees are non-negotiable.

56.     These fees are not disclosed on the vehicle's "sticker."

57.     The fees charged to the plaintiffs – fees that were imposed after the sales price was agreed upon – were $599.00 and $75.00 for the "documentary preparation fee" and "title preparation fee," respectively.

58.     DMO assesses two fees with respect to title.  First, it charges a "title fee," which (upon information and belief) is the cost to register a new vehicle in Massachusetts.

59.     In addition to this "title fee," DMO also charges a "title preparation fee" which is the cost DMO charges its customers to prepare the title in accordance with G. L. c. 90D, § 33. This fee appears separately on a different line of the bill of sale than that for the "title fee."[7]

60.     On October 12, 2019, DMO's backroom finance manager represented to the plaintiffs that the "title preparation fee" was to prepare the vehicle's title.

61.     On October 12, 2019, DMO's backroom finance manager also represented to the plaintiffs that the purpose of the "documentary preparation fee" was to prepare documentation relating to the sale of the vehicle.

62.     Both of these representations were false.

---

[7] This lawsuit challenges only the "title preparation fee," not the "title fee."

63.     These fees are nothing more than unlawful dealer markups or surcharges.

64.     While charging these fees is, in and of itself, an unfair and deceptive practice proscribed by Massachusetts law,[8] DMO lack of transparency and lies surrounding the purpose and nature of these fees make a bad situation far more unfair and deceptive.

65.     DMO unfairly and deceptively fabricates a name for these fees to falsely create a justification for imposing significant markups or surcharges.  It does this because being transparent and honest and calling these fees what they actually are (i.e., "surcharges" or "markups") would be met with disfavor resulting in customers refusing to pay.

66.     Instead, DMO is left with no choice but to turn to deception to get away with imposing these otherwise unlawful fees.  It does this by falsely claiming the fee is designed to cover costs to prepare documentation.  However, the name of these fees bares no semblance to the purported purpose of the fee.  This is because there is no conceivable way that DMO can justify charging such a high price (i.e., $674.00) for basic document preparation.

67.     Indeed, under Massachusetts law, a dealer is prohibited from charging a customer more than $5.00 to prepare a title.  *See* G. L. c. 90D, § 33.

68.     Upon information and belief, these false representations are made to all customers purchasing vehicles at DMO dealerships, and these unlawful fees are added to all DMO transactions.

C.      <u>THE BAIT AND SWITCH</u>

69.     When the plaintiffs took delivery of their vehicle, they were not given a copy of the vehicle's "sticker" or the "addendum."

---

[8] Even if these fees were properly identified as "markups" or "surcharges" to the consumer, they are still unlawful as they result in final sales prices greater than advertised or labeled, and prices that are greater than the sales prices agreed to by and between customers and their salesmen.

70.     DMO failed to provide the "sticker" to the plaintiffs, despite being required under federal law to do so.  *See* 15 U.S.C., § 1233.

71.     The reasons DMO fails to provide "stickers" is evident.  First, the "sticker" would have revealed that DMO was engaged in the "addendum fee" scam.  By providing the plaintiffs with the "sticker," the plaintiffs would have learned that the "addendum" was a forgery added by the dealership contrary to federal and state law and the plaintiffs would have realized that DMO was lying every time DMO referenced the falsely inflated MSRP.

72.     Second, the "sticker" would have revealed that the "documentary preparation" fees and "title preparation" fees were not included in the retail sales price.

73.     Third, the "sticker" would have shown that at the eleventh hour, DMO had inexplicably switched vehicles it ultimately delivered to the plaintiffs.

74.     The plaintiffs, at all relevant times, inquired about and entered into a sales transaction with DMO to purchase an AWD model of the Kia Telluride.

75.     However, without notice to the plaintiffs, DMO delivered a front-wheel drive ("FWD") model.

76.     Even some of the paperwork drafted by DMO indicated that the purchased vehicle was equipped with AWD; none of the paperwork drafted by DMO expressly identified the vehicle as being an FWD model.

77.     Many of the fields on the bill of sale that might have identified the vehicle as being FWD were left blank intentionally so as to conceal this fraud.

78.     After taking delivery of the vehicle, the plaintiffs suspected that it was FWD when the car performed poorly in the first snowstorm after purchase.

79.     Eventually, DMO confirmed and conceded that the vehicle was FWD.

80.     The plaintiffs immediately sought to exchange the vehicle so that they could take possession of an AWD model, as agreed.

81.     DMO was at first hesitant to replace the vehicle.  It falsely claimed that it was unable to locate and/or acquire an AWD model, despite several such models being shown in its online inventory and offered for sale through its website.[9]

82.     During this time, DMO informed the plaintiffs that they could continue to drive the FWD model without charge or penalty while an AWD model DMO was willing to give them could be acquired.

83.     DMO later agreed to exchange vehicles at no added cost to the plaintiffs.  But, rather than swap out the equipment, as agreed, DMO instead attempted to treat the transaction as a new vehicle sales (presumably to gain some advantage or meet some sales metric or quota set by the manufacturer) with a concurrent trade-in of the FWD model.

84.     DMO went so far to falsely claim that there was damage to the FWD model and demanded further depreciation for the miles the plaintiffs put on the FWD model, notwithstanding its earlier representations to the contrary.  All this was done to increase the delta between new and used vehicle prices and force the plaintiffs to pay even more.

85.     As a result of the trumped-up damage and depreciation occasioned by DMO's lack of urgency in locating a replacement AWD vehicle, DMO insisted that the plaintiffs pay $8,000.00 to cover the difference in models.[10]

86.     The plaintiffs refused to be victimized a second time and were left with no choice

---

[9] DMO also made no effort to use the inter-dealership locate function to acquire an AWD model.

[10] This would have been on top of the $7,622.69 the plaintiffs already paid in excess of the labeled and advertised retail sales price on the vehicle.  Indeed, DMO sought to sell plaintiffs a car at $15,622.69 over retail price.

but to leave the dealership without the promised exchange.

87.     Upon information and belief, this bait and switch tactic is a systematic problem that affects numerous DMO customers.

## IV.   CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b) of the Massachusetts Rules of Civil Procedure and G. L. c. 93A, § 9(2) on behalf of a class to be defined at the class certification stage of this litigation that is likely to include, but is not limited to:

> All consumers who purchased an automobile from any Dan O'Brien Auto Group dealership in Massachusetts from April 13, 2014 to the present (the "Class").[11]

89.     Certification of plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

90.     Numerosity – MASS. R. CIV. P. 23(a)(1).  The Class is so numerous that individual joinder of all Class members is impracticable.  Plaintiffs believe that there are thousands of Class members.  The precise number of Class members and their addresses are unknown to plaintiffs but may be ascertained from DMO's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

91.     Commonality and Predominance – MASS. R. CIV. P. 23(a)(2) and 23(b).  This action involves common questions of law and fact, which predominate over any questions

---

[11] The plaintiffs reserve the right to amend the class definition if further information and discovery indicates that the class definition should be narrowed, expanded, or otherwise modified, including but not limited to, the creation of multiple classes or subclasses.

affecting only individual Class members.  All Class members were subject to the same deception and unlawful conduct.

92.     Typicality – MASS. R. CIV. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through the uniform misconduct described herein and all Class members have the same claim, *i.e.,* that DMO engaged in unfair and deceptive pricing and other business practices such as uniform implementation of the "addendum fee" scam, charging unlawful "documentary" and "title preparation" fees, and unlawfully switching equipment without the customer's knowledge.

93.     Adequacy of Representation – MASS. R. CIV. P. 23(a)(4) and G. L. c. 93A, § 9(2).  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seeks to represent; they have retained counsel competent and experienced in class action litigation, and plaintiffs intend to prosecute this action vigorously.  The Class's interests will be fairly and adequately protected by plaintiffs and counsel.

94.     Similarly Situated and Injured Persons – G. L. c. 93A, § 9(2).  The proposed Class consists of customers who have suffered the same injury as the plaintiffs and who, for the reasons stated above, are similarly situated to each other and to the plaintiffs.

95.     Superiority – MASS. R. CIV. P. 23(b).  A class action is superior to any other available methods for fairly and efficiently adjudicating this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages suffered by plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against DMO, so it would be impracticable for Class members to individually seek redress for DMO's wrongful

conduct.  Even if the Class members could afford individual litigation, the court system could

not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and

increases the delay and expense to all parties and the court system.  By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court.

## V.      CAUSES OF ACTION

### COUNT ONE
#### UNFAIR AND DECEPTIVE BUSINESS PRACTICES, G. L. c. 93A, §§ 2 and 9

96.     Plaintiffs reallege and incorporate the allegations in the preceding paragraphs as if
set forth herein.

97.     At all relevant times, DMO was engaged in commerce for purposes of G. L. c.
93A.

98.     G. L. c. 93A, § 2 provides that "[u]nfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or commerce are hereby declared
unlawful."  G. L. c. 93A, § 9 permits any consumer injured by a violation of c. 93A, § 2 to bring
a civil action, including a class action, for damages and injunctive relief.

99.     DMO engaged in a pattern of deceitful, intentionally misleading, unfair, and
deceptive conduct including, but not limited to the conduct described in paragraphs 100 through
115, below.

100.     DMO acted unfair and deceptively in falsifying "addenda" that were affixed to
each vehicle it sold so that the consumer would erroneously believe that the total price included
on the "addenda" reflected the MSRP that was part of the federally mandated disclosures used to
provide accurate, transparent and uniform pricing information to all consumers.  *See, e.g.,* 15

U.S.C., §§ 1231-1233.

101.   DMO acted unfairly and deceptively in falsely referring to the artificially inflated prices set out in these "addenda" as the MSRP during negotiations, discussions about the vehicle, and in its advertisements and website content.

102.   DMO acted unfairly and deceptively in violating the AIDA that prohibits dealerships from altering or amending the "window sticker." *See* 15 U.S.C., § 1233.

103.   DMO acted unfairly and deceptively in violating the AIDA that requires the dealership to give the "sticker" to the consumer at delivery. *See* 15 U.S.C., § 1233.

104.   DMO acted unfairly and deceptively by charging customers in excess of the amount of its advertised price and/or the price stated on the price tag or "sticker" for these vehicles. *See* 940 CODE MASS. REGS., § 3.13(1)(f).

105.   DMO acted unfairly and deceptively in failing to properly affix to each vehicle the price at which the vehicles were to be sold. *See* 940 CODE MASS. REGS., § 3.13(1)(a).

106.   DMO acted unfairly and deceptively by engaging in a drip price scam designed to increase the price of the vehicles sold to a price that was higher than the advertised price or price offered for sale. *See* 940 CODE MASS. REGS., § 3.13(1)(f).

107.   DMO acted unfairly and deceptively by engaging in a drip price scam designed to increase the price of vehicles sold after an agreed upon sales price is reached between the customer and salesman. *See* 940 CODE MASS. REGS., § 5.04(10).

108.   DMO acted unfairly and deceptively by advertising vehicles for sale that were not available to be delivered to the customer. *See, e.g.*, 940 CODE MASS. REGS., § 3.02(1).

109.   DMO acted unfairly and deceptively by falsifying the purpose of assessing "documentary preparation" fees.

110.    DMO acted unfairly and deceptively in charging the "documentary preparation" fees.

111.    DMO acted unfairly and deceptively by falsifying the purpose of assessing "title preparation" fees.

112.    DMO acted unfairly and deceptively in charging in excess of $5.00 for title preparation. *See* G. L. c. 90D, § 33.

113.    Plaintiff and Class members were injured by DMO's conduct as alleged herein by purchasing vehicles based on unlawful fees, improper disclosures, and outright lies concerning the nature of surcharges and markups that were charged to the consumer.

114.    All of these unfair and deceptive practices were carried out systematically and uniformly at all of DMO's Massachusetts dealerships.

115.    All other claims, causes of action, and conduct described herein constitute per se violations of Chapter 93A.

116.    DMO's unfair and deceptive acts or practices, as alleged herein, were and are willful and knowing violations of G. L. c. 93A, § 2.

117.    On or about April 13, 2020, plaintiffs made a demand for relief, in writing, to DMO, on behalf of themselves and the Class as required by G. L. c. 93A, § 9(3).

118.    DMO failed to respond to the Chapter 93A demand letter with a reasonable offer of settlement.  Instead, DMO continued to provide false and misleading information about the consumer transaction and used the good faith demand/offer of settlement requirement of Chapter 93A as a way to further its deception.  In one instance, DMO went so far to state "[a]t this time, unfortunately, an AWD Telluride is not available," while simultaneously advertising 25 AWD Telluride vehicles available for sale on its website.  *See, e.g.*, 940 CODE MASS. REGS., § 3.02(1).

119.    Based on the foregoing, plaintiffs and the other members of the Class are entitled to all remedies available pursuant to G. L. c. 93A, § 9, including, but not limited to actual damages, statutory damages (to the extent that they are greater than actual damages), double or treble damages, disgorgement of DMO's profits derived from its unlawful activities, injunctive relief, attorneys' fees and other reasonable costs.

## COUNT TWO
### UNJUST ENRICHMENT

120.    Plaintiffs reallege and incorporate the allegations in the preceding paragraphs as if set forth herein.

121.    Plaintiffs and the other Class members conferred a benefit upon DMO in the payments they provided to DMO to purchase their vehicles.

122.    DMO had an appreciation or knowledge of the commercial value of the payments paid by the plaintiffs and the other members of the Class.

123.    DMO's acceptance or retention of these benefits is inequitable under the circumstances outlined above and entitles plaintiffs and Class members to restitution or such other compensation as is appropriate in the circumstances.

## COUNT THREE
### BREACH OF CONTRACT

124.    Plaintiffs reallege and incorporate the allegations in the preceding paragraphs as if set forth herein.

125.    Plaintiffs and members of the Class entered into contracts with DMO to purchase vehicles.

126.    Plaintiffs and members of the Class have fully performed all covenants, conditions and obligations required by them, except to the extent made impossible by DMO's

breach of these contracts.

127.    DMO breached these agreements by engaging in a drip pricing scam designed to charge customers more than the prices they agreed to pay.

128.    As a direct and proximate cause of DMO's breach, the plaintiffs and members of the Class have incurred significant financial damages.

## COUNT FOUR
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

129.    Plaintiffs realleges and incorporates the allegations in the preceding paragraphs as if set forth herein.

130.    Plaintiffs and members of the Class entered into sales contracts to purchase vehicles from DMO.

131.    These contracts between the parties came with an implied duty of good faith and fair dealing.

132.    DMO breached this duty by engaging in drip pricing schemes designed to increase the price of the vehicle after prices were agreed to between the parties.

133.    As a direct and proximate cause of DMO's breaches, plaintiffs and members of the Class have incurred significant financial damages.

## COUNT FIVE
### FRAUD

134.    Plaintiffs reallege and incorporate the allegations in the preceding paragraphs as if set forth herein.

135.    DMO falsely and fraudulently created "addenda," which were intentionally designed by DMO to be confused with federally mandated "stickers" given the similarities in colors, fonts, icons and illustrations.  These artfully crafted "addenda" were not, in fact, part of

the actual "stickers," but instead forgeries designed to alter or amend the AIDA disclosures and falsely increase the MSRP.

136.    DMO fraudulently referred to these inflated prices as the MSRP in advertisements and throughout the sales process, when the MSRP –  which is set by the manufacturer as required by federal law – was actually significantly lower.

137.    These false statements contained on the "addenda," as well as all other statements made by DMO about the MSRP in advertisement and during the sales process, were material to each sales transaction.  This is because the "addenda" falsely asserted that the MSRP of each vehicle was higher than the prices that were uniformly set and disclosed at all Kia dealerships throughout the country.  By lying about the MSRP, the customers are led to believe they are getting a vehicle with a higher fair market value.  The MSRP is used by consumers (including the plaintiffs) as a jumping off point for price negotiations as it is the only objective metric used in the pricing process.  If consumers are lied to about this objective metric, they lose the ability to make any reasoned and educated decision about the vehicle they purchase.

138.    One of the intended fraudulent purposes of the "addendum fee" scam was to induce the consumer into paying more for the vehicle than the advertised and/or stated retail sales price by falsely inflating the MSRP.

139.    Another intended fraudulent purpose of the "addendum fee" scam was to charge customers for items advertised as being free to all customers.

140.    The plaintiffs and members of the Class justifiably relied on the forgeries contained on the "addenda" (and other statements made in advertisements and during the sales process that falsely inflated the MSRP) in paying more for the vehicles than they otherwise would have had to pay had DMO not unlawfully altered the "stickers" to deceive its customers.

141.    DMO also engaged in fraud by lying about the purpose of the "title preparation" and "documentary preparation" fees to mask the imposition of unlawful surcharges and fees.

142.    DMO further engaged in fraud by engaging in the "bait and switch" practices where it agreed to sell its customers one car, only to delver a different car after the transaction had been consummated.  To further this fraudulent scheme, DMO intentionally omitted key information from the bill of sale and failed to deliver the "sticker" to the customers when the vehicle was delivered.

143.    As a direct and proximate result of DMO's fraudulent conduct, the plaintiffs and members of the Class have suffered damages by way of increased prices paid for the vehicles they purchased.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the plaintiffs Rachel Freedman and Jeffrey Greenberg, individually and on behalf of the other members of the Class, respectfully requests that the Court order the following relief:

A.    An Order certifying the Class as requested herein;

B.    Actual damages or statutory damages in an amount to be determined at trial;

C.    Double or treble damages, as afforded by law;

D.    An Order enjoining DMO from continuing to engage in the unfair and deceptive acts or practices alleged;

E.    Reasonable attorneys' fees and costs to plaintiff and the Class; and

F.    Such other and further relief as may be just and proper.

## VII.   JURY DEMAND

Plaintiffs and the Class demand a trial by jury of all claims in this Complaint so triable.

Respectfully submitted,

*/s/ Joshua N. Garick*

_____

Joshua N. Garick (BBO #674603)
LAW OFFICES OF JOSHUA N. GARICK, P.C.
34 Salem Street, Suite 202
Reading, Massachusetts 01867
Phone:  (617) 600-7520
Joshua@GarickLaw.com

*Counsel for Plaintiffs and the Class*

Dated:  August 13, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, the foregoing was filed electronically using the Court's CM/ECF system which will send notification of such filing to all registered individuals.

*/s/ Joshua N. Garick*

_____

Joshua N. Garick, Esq.

Dated:   August 13, 2020